Timofei Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **Timofei Mouraveiko and Kathryn Ash**; Plaintiffs, Vs. **The Oregon District of the United Pentecostal Church, The Life Church, Portland Life Church, Chad Williams, Timothy Scott, The Home Depot, Inc., The Home Depot U.S.A., Inc., Wilco Farmers (DBA "Wilco Farm Stores"), Helena Agri-Enterprises, LLC, Southern Agricultural Insecticides, Inc. (DBA "Southern Ag"), Winfield Solutions, LLC, Corteva, Inc. (DBA "Corteva Agriscience"), Does 1-50, John Doe Manufacturer**, Defendants. | CIVIL CASE NO.: 3:26-CV-01824-YY<br>**COMPLAINT**<br>**JURY TRIAL REQUESTED** |

Plaintiffs Kathryn Ash ("Ash") and Timofei Mouraveiko ("Mouraveiko") (collectively "Plaintiffs") allege the following:

## I. INTRODUCTION

[1] The promotion and expansion of pesticide use in residential areas is a growing public concern in the United States. Glyphosate has infamously received widespread public attention for the adverse health effects of exposure, yet, under the radar, a non-glyphosate



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

#117987

commercial herbicide, named Crossbow, that has few, if any, practical applications in farming and is illegal to use near or in residential areas, has been promoted for residential use and put in the hands of homeowners and other residential consumers for non-peaceful purposes by consumer-oriented retailers and others who profit from the illegal deployment of this toxic chemical.

[2] Plaintiffs, who with their family of seven own and live in an urban residential neighborhood, had this brought to their attention in an immediate, unavoidable context – in their own home and garden – when a neighboring property deployed Crossbow, intentionally sprayed it on people and on Plaintiffs' property, contaminated Plaintiffs' property, killed or injured plants and animals, and harmed Plaintiffs' and their childrens' health and well being, which is ongoing. Plaintiffs' property was not the only neighboring property affected.

## II. PARTIES

[3] Plaintiffs are private citizens. They own and reside at 5006 SW Pomona St, Portland, OR 97219 ("Mouraveiko Property").

[4] The Home Depot, Inc. and The Home Depot U.S.A., Inc. are Delaware corporations headquartered in Atlanta, Georgia. They own and operate The Home Depot Stores and The Home Depot website and both operate under the DBA The Home Depot. They will be collectively referred to as "The Home Depot." The Home Depot operates home improvement retail stores located in cities across the State of Oregon and the United States, and markets and sells products on its website, homedepot.com. One third of the twenty-seven The Home Depot stores in Oregon are located in the Portland-Metro area. The Home Depot styles itself the "#1 Home Improvement Retailer" on its website and Google Maps describes The Home Depot stores as a "warehouse-like home improvement retailer." The Home Depot website is a primary and trusted source of information and know-how for the products it sells. Its customers are 77% urban or suburban. The Home Depot's typical shopper is a white woman



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

over 60 years old who owns her home in the suburbs.[1]

[5] Wilco Farm Stores ("Wilco") is an assumed business name for Wilco Farmers, a farmer-owned coop incorporated and headquartered in Oregon. Wilco operates stores in California (2), Oregon (18) and Washington (8), promoting a rural lifestyle brand to over 500,000 customers, including urban and suburban homeowners, offering "garden supplies, nursery quality plants, a full work wear and rural lifestyle clothing department, pet supplies and dog grooming, paint and hardware."

[6] Timothy Scott ("Scott") is a natural person and maintains a residence in Portland, Oregon.

[7] Chad Williams ("Williams") is a natural person and maintains a place of residence in Beaverton, Oregon.

[8] The Life Church is the name for and one of the locations of the Oregon District of the United Pentecostal Church, which operates and maintains the property located at 5016 SW Pomona St, Portland, OR 97219, which is immediately adjacent to the west of Plaintiffs' property ("Church Lot").

[9] The Oregon District of the United Pentecostal Church ("ORUPC") is a domestic nonprofit corporation registered with the State of Oregon.

[10] Does 1 – 50 are natural persons and associates of the Church Defendants. Their identities have not been established. They are persons who have expressed dissatisfaction with Plaintiffs' trees, either to Plaintiffs or each other or other Church Defendants; who desired removal of or harm to Plaintiffs' trees and communicated about the same to, either to Plaintiffs or each other or other Church Defendants; who actually cut or otherwise injured Plaintiffs' trees; who attempted to or actually entered Plaintiffs' property or supervised,

---

[1] "DIY shoppers turn to the store for supplies to complete their own projects." Home Depot's Typical Customer Profile, Business Insider. Available at https://www.businessinsider.com/home-depot-typical-customer-demographics-shopper-profile.



Tim Mouravciko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

approved or encouraged others to do so; who desired, approved or supervised acquisition of any herbicides used or intended to be used on or around the Church Lot; who desired a perceived or actual result or benefit that would flow or they perceive would flow from injury to Plaintiffs' trees or the deployment of Crossbow or other herbicides; who supervised, approved or cooperated with any landscape activities at the Church Lot; who by law were required to supervise the proper application of herbicides on or around the Church Lot; or who should have exercised proper oversight over activities on the Church Lot as required under the law.

[11] Portland Life Church is domestic nonprofit corporation registered with the State of Oregon. Multnomah County records list it as the owner of the Church Lot.

[12] Scott, Williams, The Life Church, the Oregon District of the United Pentecostal Church, Portland Life Church and Does 1 – 50 will be collectively referred to herein as the "Church Defendants."

[13] Southern Agricultural Insecticides, Inc. ("Southern Ag") is incorporated and headquartered in the State of Florida. It distributes and markets Crossbow herbicide ("Crossbow") through The Home Depot's retail stores and website.

[14] Helena Agri-Enterprises, LLC ("Helena"), formerly Helena Chemical Company, is incorporated in Delaware and headquartered in Tennessee. Helena distributes Crossbow. On Plaintiffs' information and belief, Helena manufactures Crossbow.

[15] Winfield Solutions, LLC ("Winfield") is incorporated in Delaware and headquartered in Minnesota. It distributes Crossbow through Wilco. Winfield and Wilco have a close long-standing business partnership. Together Wilco and Winfield formed Wilco-Winfield LLC in 2006.

[16] Corteva, Inc. ("Corteva"), formerly Dow Agrosciences, LLC, is a publicly traded company incorporated in Delaware and headquartered in Indiana. It is the original manufacturer of Crossbow and has agreements with Southern Ag, Helena, Winfield and



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-8398

others to repackage, market and distribute Crossbow.

[17] John Doe Manufacturer ("John Doe Mfg") is the yet-to-be-determined entity that manufactured the Crossbow used by Church Defendants.

[18] The Home Depot, Wilco, Southern Ag, Helena, Winfield, Corteva and John Doe Mfg will be collectively referred to herein as the "Crossbow Defendants."

## III. JURISDICTION AND VENUE

[19] This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1343 because the matters in controversy arise under questions of federal law and diversity.

[20] This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and is empowered to grant injunctive relief pursuant to Fed. R. Civ. P. 57 and 65.

[21] Venue is proper in the Portland Division of the District of Oregon under 28 U.S.C. § 1391(b)(1) and (2) because the events and conduct complained of herein all occurred within this Judicial District.

## IV. FACTS

[22] Plaintiffs own and reside at the Mouraveiko Property with their five minor children and have planted and maintained a garden on the property for over fifteen years, including amending and improving the soil throughout the Mouraveiko Property over the same period of time. The Mouraveiko Property is a residential property with a single-family detached home. It is closed to the public and fully fenced off from surrounding properties, including the Church Lot.

[23] Plaintiffs have planted, grown and cultivated over 300 distinct named types of plants on their property without the use of any herbicides, insecticides or any pesticides of any kind. These plants include, but are not limited to, culinary, tea and medicinal herbs, flowering perennials, flowering and fruiting shrubs, flowering and fruiting trees, shade trees, annuals and vegetables. Many of the types of produce Plaintiffs grow are not commercially available or easily obtainable at any price.



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

[24] The entire Mouraveiko family has been involved in planning and tending the garden and enjoying its flowers, fruits, produce and shade, among other things. The outdoor space of the Mouraveiko Property is an indispensable extension of the residence, as Plaintiffs and their children learned in, worked in, recreated in, relaxed in, entertained in and enjoyed their outdoor spaces year round, up until July 4.

[25] Plaintiffs maintained a research setup into honeybees in their garden, with research aimed at increasing efficiency and automation, and creating methods and systems for producing high-quality honey without any supplements artificial to the bees, and to reduce stress on the bees and study the effects of various methods for doing so through the use of technology for control and monitoring of the beehive environment, including electronics, sensors and etc. One of the goals was to produce a system through mechanical, electric and electronic designs and horticultural integration to allow access to real, unadulterated honey in an urban environment with a small footprint and without the need to be a traditional beekeeper, with a scaling option for farmers.[2]

[26] Plaintiffs researched, developed and tested different mechanical, structural and electrical designs for their beehives, and used materials to build them of a kind that would not be contaminated by chemicals and would mimic the types of materials honeybees naturally seek out in the wild, so as not to skew results, among other reasons. Plaintiffs did

---

[2] The honey commercially available to consumers is frequently adulterated. "Honey is characterized as a natural and raw foodstuff that can be consumed not only as a sweetener but also as medicine due to its therapeutic impact on human health. It is prone to adulterants caused by humans that manipulate the quality of honey." Fakhlaei, Rafieh et al, "The Toxic Impact of Honey Adulteration: A Review," MDPI journal *Foods,* 2020, 9, 1538, October 26, 2020. "Honey adulteration, where a range of sugar syrups is used to increase bulk volume, is a common problem that has significant negative impacts on the honey industry, both economically and from a consumer confidence perspective." Islam, Md Khairul et al, "Sugar Profiling of Honeys for Authentication and Detection of Adulterants Using High-Performance Thin Layer Chromatography," MDPI Journal *Molucules*, 2020, 25, 5289, November 13, 2020. "The authenticity of honey currently poses challenges to food quality control, thus requiring continuous modernization and improvement of related analytical methodologies." Zhang, Xiao-Hua et al, "A comprehensive review of the current trends and recent advancements on the authenticity of honey," *Food Chemistry: X*, 19 2023.



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

not use any chemicals on the beehive, as honeybees regularly spend time interacting with and examining the interiors or exteriors of their homes, other than non-toxic wood glue on surfaces not accessible to the bees. Bee-orientation markings were applied with non-toxic paint and covered with wax.

[27] Plaintiffs and their family monitored the beehives year-round, almost daily during colder times and multiple times per day in warmer. The entire family has been intimately involved in the project over several years. Plaintiffs had selected and bred a lineage of superior, prolific and tough queen bees and gone through many hive design iterations. This required years of design and research.

[28] Plaintiffs do not use any chemicals on their honeybees nor in or around the hives, instead researching and using natural supplements, derived from mint and other herbs grown on the Mouraveiko Property. The diversity and composition of plants nearby are integral to the health and well being of the Mouraveiko family and of their bees.

[29] Mouraveiko holds two U.S. patents and actively develops new technologies.

[30] The fence located on the western side of Plaintiffs' property stands wholly on Plaintiffs' property and is Plaintiffs' property. Church Defendants are aware that the Mouraveiko Property extends beyond the fence and have observed and acknowledged the placement of the property markers showing the same.

[31] Plaintiffs planted a grouping of birches that runs along the western edge of the Mouraveiko Property, providing beauty, shade and privacy, and birch sap, as well as protecting the west side of the residence from the hot sun in the afternoons and stabilizing the soil to prevent erosion. Plaintiffs' children named this area the Birch Grove and it was a very special place for them to play and daydream in.

### A. The Spraying of Crossbow Herbicide July 4, 2026

[32] July 4, 2026 started out as another dry, sunny, hot day. Early in the afternoon the wind was blowing predominately from the West, as is normal in the Summer at the



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

Mouraveiko Property. The temperature around the Mouraveiko Property was above 77 degrees F in the shade on the north side of the house and around 80 degrees F on the south side and rising. As was typical in warm weather, Plaintiffs had most of the windows of their house open, including on the two upper levels where the main living areas, kitchen and bedrooms are located. The windows of Plaintiffs' house are clearly visible from the surrounding properties. The breeze was coming in through the windows into the kitchen and other areas of the house.

[33] Plaintiffs observed Scott in the Church Lot. Scott was wearing a manual-pump backpack sprayer with a sprayer wand. When Plaintiffs first observed him he was spraying on the other side of Plaintiffs' western fence. He was walking north and south along the fenceline, at times close enough to the fence that the fence blocked sight of him from the Mouraveiko house. Immediately in front of Scott were Plaintiffs' fruit trees with fruit on them, literally hanging within reach in front of and above him. These fruit trees and the birches immediately to the North provided shade to Plaintiffs' beehives, from which bees (several bees per second) were flying above Scott's head, as he was spraying.

[34] The visible plume of the spray from Scott's sprayer wand was at or above the level of Scott's head.

[35] Plaintiffs' children were walking on the west side of the Mouraveiko Property while Scott was near to and spraying toward the Mouraveiko Property. Scott was aware of their presence, but continued spraying. Some of the spray landed on Plaintiffs' children.

[36] Mouraveiko asked Scott what he was doing. Scott continued to spray and some of the spray landed on Mouraveiko and the children. Scott stated that he was not using Roundup or stuff like that, but an herbicide called "Crossbow." Scott stated Church Defendants were tired of cutting things back and wanted to instead spray stuff and have the chemical be effective for a long time. He stated that Crossbow will remain active for a long time. Mouraveiko told Scott that he was poisoning Plaintiffs and their family and their honeybees.



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

Scott stated he was going to "continue killing" and did exactly that, proceeding to spray and empty out the four-gallon reservoir of the backpack sprayer. When Plaintiffs first observed Scott, the backpack sprayer was almost full and when Scott left the Church Lot the sprayer reservior was completely empty.

[37] Scott sprayed Plaintiffs' property. Plaintiffs observed spray droplets on the Mouraveiko Property. In the house Plaintiffs could smell Crossbow and on themselves and their clothing.

[38] A report of loss was filed with the Department of Agriculture and copies mailed to the Church Defendants within sixty days of July 4, 2026.

[39] Crossbow, by its nature and design, travels invisibly through the air. It cannot be contained within the Church Lot, or kept away from the Mouraveiko Property or other properties surrounding the Church Lot. Testing done after July 4 confirmed the presence of the two main agents of Crossbow, triclopyr and 2,4-D, across and throughout the Mouraveiko Property.

[40] Widespread plant injury appeared on the Mouraveiko Property shortly after the July 4. Leaves contorted, curled, cupped, dessicated, browned, yellowed and discolored in escalating waves among different types of plants, among other things. Some plants showed signs right away, others later. Different kinds of plants exhibited the effects of Crossbow at different rates and in different manners, some like the pie cherry tree appearing to have been freeze-dried with curled up or crumpled matte greyish-green leaves. The leaves of some plants appeared unnaturally wet, as if they were perspiring, while new growth on others was cupped, discolored or twisted. The birches appeared to dessicate at their tops and then started yellowing, browning and losing leaves throughout. All plants throughout the Mouraveiko Property and beyond are injured by the Crossbow chemicals.

[41] Church Defendants had been observing Plaintiffs. One morning when the parking lot at the Church Lot was completely empty Plaintiffs walked along the parking lot to



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

photograph their plants. A woman drove up and immediately started yelling at Plaintiffs to leave the Church Lot and threatening to call the police. She stated that the Church Lot was not open to the public and otherwise acted like it was her property. On Plaintiffs' information and believe, she is a member of Church Defendants and likely cohabitates and engages in church-related activities with Williams.

[42] After school was out for the Summer Plaintiffs and their children had been working every day to continue the lineage of their most productive queen bee and the children were planning out a Summer of documenting the developments, in order to be able to present it once back in school for credit and recognition of their efforts.

[43] Immediately after July 4 there was a dramatic, severe die-off of Plaintiffs' honeybees. Dead bee carcasses accumulated in piles over an inch thick in front of the beehives.

[44] Plaintiffs' multi-year research and development effort was completely ruined. Plaintiffs can do nothing about it and not even restart it at the Mouraveiko Property. It was particularly painful, because in the Spring the results of the designs and processes developed for the bees had been great and Plaintiffs were looking ahead to quantifying the results and continuing with the venture, including commercial development and recognition.

[45] Plaintiffs normally had a lot of songbirds on their property in the morning. After July 4, the mornings were completely silent – the birds were gone. On July 6 a bird was observed near the birches that was disoriented and unable to fly. In this whole time, no birds or other wildlife touched the ripe figs, grapes, apricots or blackberries or other fruits, other than a squirrel that took a bite of a fig, then immediately ran off and never came back. In past years, not-yet-harvested ripe figs were eaten down to the stem by birds, raccoons and squirrels – the same with other fruits and berries – but this year figs, other fruits and berries remained untouched.

[46] Similarly, while Plaintiffs frequently had squirrels all around the Mouraveiko Property, after July 4 they have rarely seen any squirrels, other than the one mentioned above



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

and one that was observed repetitively running circles around the base of a tree on or around July 27.

[47] Plaintiffs' cat had been expecting kittens, but after July 4 lost her pregnancy and then ran off and refuses to stay at the Mouraveiko Property.

[48] The unpleasant smell of the Crossbow chemicals was overpowering on the Mouraveiko Property after July 4, such that stepping out into the garden caused burning eyes and throats, dizziness, lightheadedness, headaches and other health effects. As of the writing of this Complaint, the smell remains.

[49] Plaintiffs contacted several real estate professionals, including appraisers, for assistance in figuring out the market value of the Mouraveiko Property, only to discover that without remediation, i.e., a third party assuming liability for any effects of Crossbow and resulting injury to the trees and shrubs, any sale would not reflect the actual market value. The moment Crossbow hit the Mouraveiko Property it created liability and diminished the value of it to zero. A clean, clear sale would have not been possible at any price, in part because there is realistically no way to fully or adequately disclose or disclaim the risks and hazards associated with the chemical injury caused to the trees, shrubs and other vegetation on the Mouraveiko Property, nor value the liability, in part because Defendants took affirmative steps to hide material information related to Crossbow and its deployment. Any such sale would go against public policy, at least in Oregon, as Plaintiffs themselves experienced health effects.

[50] Any valuation of the Mouraveiko Property must take into consideration the chemical injury inside the trees and shrubs, which are still standing on the property, and the liability created by them. In the Pacific Northwest's climate injured trees are a hazard and a liability.

[51] Real estate professionals are unable to value the Mouraveiko Property's high quantity and diversity of plants, independent of the presence or absence of Crossbow, not because they do not have value (they agreed that they do have value), but because they have no way



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

to compare it to other properties, among other things. This type of data is not captured in real estate listings. As a result, an accurate estimation of the diminishment of value of the Mouraveiko Property due to the injuries to its trees and shrubs is impossible to obtain.

[52] The replacement value / cost of the injured trees and shrubs on the Mouraveiko Property is estimated to be in excess of $1,000,000. Replacing mature trees is a major construction project, requiring heavy duty machinery like tree spades and cranes, specialized labor and high transportation costs, and consideration for the conditions of the site, such as spatial constraints, soil stability and nearby structures. On the Mouraveiko Property, special care is necessary, because trees anchor the soil of the westward and southward slope near the house, requiring special engineering and temporary or permanent retaining walls to maintain the integrity and stability of the house. Conducting remediation while the Crossbow chemicals are still active is neither feasible nor practical, nor while the house is occupied.

[53] Estimating the liability due to the chemical injury and then factoring it into the market value of an unremediated property goes beyond the capabilities and methodologies of the real estate profession. Among other things Plaintiffs cannot forecast when the Mouraveiko Property would be free of Crossbow, nor assess or disclaim any of the risks associated with Crossbow-caused injuries, nor give any potential buyer an adequate picture of what it is they are actually purchasing nor provide the legally required disclosures. In the event of any sale, Plaintiffs would always be subject to the claim that they should have known something. Therefore, it is not possible to establish any price.

[54] Prior to the dispersal of Crossbow on July 4, 2026, Multnomah County valued the Mouraveiko Property at $1,059,900, based on the size of the land, location and structures.

[55] The problem with the nature of the chemical injury arises out of the characteristics of Crossbow, which give it the nature of a chemical weapon. Among other things, it is rainfast, takes a very long time to abate, is highly volatile in warm temperatures and highly mobile as an invisible vapor. It is harmful to humans and animals and has no antidote. Crossbow, a



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

direct descendent of Agent Orange, is designed to be harmful in miniscule doses – at the level of molecules.

[56] Given that the wind during warmer months is predominately from the West, with 2026 being no exception, and the volatility of the Crossbow chemicals, these chemicals continue to be redeposited on the Mouraveiko Property and other surrounding properties, even though weeks have passed since July 4.

[57] Church Defendants' unlawful and intentional act has placed Plaintiffs in an untenable situation.

[58] Before any effective remediation of the Mouraveiko Property can begin, the origin of the Crossbow chemicals must be abated. Currently all trees, shrubs and other vegetation on the Mouraveiko Property are continuously receiving additional fluctuating doses of the Crossbow chemicals, which will continue causing harm as long as they exist.

[59] Scott himself told Plaintiffs that Crossbow will persist and continue harming plants for a long time after application. He said Church Defendants were looking for something that would work for not just a few of months, but for a long time. Church Defendants selected Crossbow for its chemical weapon style properties and persistence.

[60] Plaintiffs and their children have made every effort to limit their time outdoors on the Mouraveiko Property. Mouraveiko and two of Plaintiffs' children were sprayed with Crossbow on July 4 – on their skin, their hair, their clothing, and etc.

[61] Plaintiffs and their children suffered immediate health effects from exposure to Crossbow, which prevented them from enjoying their property, doing planned family activities or many activities at all, among other things. It affected their balance, vision, neurological system and general well being, causing various pains and discomforts, among many other things. The effects were severe enough that at times Plaintiffs and their children were functionally incapacitated and unable to conduct their normal activities. Their health providers said there was no treatment for exposure to Crossbow, but if it became severely life



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

threatening, to seek emergency assistance.

[62] The health effects have continued through the filing of this litigation.

[63] Plaintiffs contacted poison control three separate times and consulted doctors for evaluation and seeking suggestions for treatment. The doctors requested the exact product name and EPA registration number for the product used, among other things, to aid in development of a treatment or mitigation plan, however, Church Defendants intentionally and maliciously refused to communicate with Plaintiffs, despite repeated requests made to them by phone and in writing since July 5.

[64] It took tremendous emotional toll on Plaintiffs and Plaintiffs' children to see the ruin of their garden, their honeybees and their work, while experiencing emotional and physical pain and suffering, including fear and worry for the future and whether it would happen again. Instead of happily enjoying the living, green, fruitful thing that was their garden, Plaintiffs and their children get to observe firsthand the slow death and decay of the living things they had tended for years, while suffering the adverse effects of Crossbow themselves.

[65] Crossbow Defendants are uniquely in possession of information about the Crossbow chemicals, for example, studies and research concerning the effects, longevity and decay of Crossbow chemicals, that would have helped Plaintiffs and the doctors reduce and alleviate the effects of continuous exposure to Crossbow and help formulate potential treatments, however, they have intentionally withheld it from the public and the medical and research communities. Crossbow Defendants clearly have this information, as it informed the composition of the labels they submitted to the EPA for registration and approval. This is information that would be vital for medical professionals, including toxicologists and Poison Control, to adequately assess risks and the severity of exposure, and advise and evaluate the proper courses of action for exposure to Crossbow. Plaintiffs even contacted the EPA and other agencies, but lack of information has prevented them from providing Plaintiffs with any information on how bad their exposure is, what to expect nor what to do.



Tim Mouravciko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

[66] This has placed severe stress on Plaintiffs and their family. This happened to their home – where they live, work and study and which is a substantial asset. The whole situation and its effects have created a lot of disorientation and confusion, because the effects of Crossbow are unpredictable. It has taken a severe toll on Plaintiffs' and their family's quality of life.

[67] No person would reasonably expect that someone could casually buy a bunch of Crossbow, a chemical that can cause widespread harm far beyond its site of application and persist in the environment and continue causing harm for a long time, from consumer-oriented retailers like The Home Depot and Wilco. Even chlorine gas, which has received a lot of attention and resulted in prosecutions for chemical weapons violations, does not have these properties, as chlorine gas breaks down quickly in the environment. The harm Defendants have wrought with Crossbow, by comparison, is far more severe and persistent. They have intentionally legitimized a weapons-grade toxic chemical.

[68] 30 residences, three restaurants (two with outdoor spaces) and a 7-11 store lie within 250 feet from where Crossbow was applied on July 4. Many of these residences have fruit trees, berry plants and vegetable and flower gardens. Most of the residents, owners and users of these properties are oblivous to their exposure, as Crossbow drift is invisible and injurious.[3]

[69] Plaintiffs observed signs of plant injury attributable to Crossbow and its smell in and along public rights-of-way to the west, the north, the south and the east of the Church Lot, including identical damage to cherry trees and tomato plants as appeared on the Mouraveiko Property. The Oregon Department of Agriculture said they would knock on the doors of the neighboring properties themselves, and had excellent translation services available, if

---

[3] Defendants knew or should have known that the use of Crossbow in a residential neighborhood, particularly and urban neighborhood, would cause harm and injury over a wide area and across many properties. As the Crossbow label states, "Very small quantities of spray, which may not be visible may seriously injure susceptible plants."



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

necessary. Plaintiffs certainly hoped they did.

[70] On July 30, 2026 Scott and another individual showed up with powered equipment, including a lawn mower and at least one string trimmer and mowed, hacked and weed whacked the portion of the Church Lot immediately adjacent to the Mouraveiko Property. This caused a lot of contaminated dust and small particles of contaminated plant matter to disperse in the air. Wind was from the west, which brought these contaminated materials over onto the Mouraveiko Property.

[71] Before Scott and the other individual began their activities Plaintiffs energetically tried to get their attention and asked them to not to do anything, however, they completely ignored them.

[72] Plaintiffs and their children dropped everything and immediately left the Mouraveiko Property. After the mowing and weed whacking activities on the Church Lot, Plaintiffs and their children experienced substantially worsening symptoms and health effects, including spontaneous bleeding.

**B. Crossbow Herbicide**

[73] The EPA-approved label for Crossbow is the federal law governing its application, storage and use under the Federal Insecticide Fungicide and Rodenticide Act (FIFRA). As the EPA has declared time and again, "The label is the law."[4]

[74] The EPA-approved labels for Crossbow make clear that Crossbow is not for use in or near residential areas, should not come in contact with people or pets, presents hazards to humans and domestic animals, should not be dispersed on or near crops intended for human consumption, ornamental plants, bodies of water, water intended for domestic use or irrigation, or habitat for non-target species, either directly or through the drift of vapor (which may be invisible). Crossbow is specifically injurious to all plants grown in residential

---

[4] See, e.g., EPA, *Pesticide Registration Manual* (last updated April 2017), available at https://www.epa.gov/pesticide-registration/pesticide-registration-manual.



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

areas, including but not limited to, flowers, fruit trees, ornamentals, grapes, sunflowers, beans, tomatoes and other vegetables.

[75] Crossbow is a hazardous substance; exposure to it is dangerous to humans and animals and affects their health and wellbeing. Even for short term exposure, such as during application, personal protective equipment is required. The labels' statements that Crossbow is hazardous to humans and animals and that Crossbow should not be applied in or near residential areas prohibits its applications near peoples' residences.

[76] It is recognized that the presence of Crossbow in soil inhibits seed germination and plant growth.

[77] The two active ingredients of Crossbow are 2,4-dichlorophenoxyacetic acid butoxyethyl ester ("2,4-D") at 34.4% and 3,5,6-trichloro-2-pyridinyloxyacetic acid butoxyethyl ester ("Triclopyr") at 16.5%.

[78] These are the ester forms of 2,4-D and Triclopyr, which are not water-soluble. When combined with water, it does not dissolve, but forms a suspension. This is a selling point for Crossbow, as this makes it much more persistent in the environment, prolonging its effects.[5]

[79] Crossbow is volatile in dry and hot conditions. With warming temperatures it rises in the air, migrates with air currents and thereby spreads to new areas, hours and days, if not weeks, after the original application. Its volatility increases as temperatures rise.[6] There is no "lowest" volatilization point, as volatilization (e.g., evaporating and off-gassing) is a continuous thermodynamic process that occurs at varying rates depending on both vapor pressure and temperature. Chemical compounds possess a continuous vapor pressure that allows evaporation at a wide range of temperatures. In the case of herbicides, ester versions

[5] The butoxyethyl ester form of 2,4-D has a much longer half-life than other forms.

[6] Since July 4 the temperature has frequently been above 75 degrees and up to around 100 degrees. Seasonal weather patterns in the Portland Metro area make it likely that temperatures above and well above 75 degrees will continue into mid and even late October.



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

have higher vapor pressures than amine salt versions, meaning increased volatilization.[7]

[80] 2,4-D, Triclopyr and Crossbow's other ingredients absorb through the skin and inhalation.

[81] 2,4-D threatens not just the targeted weeds, but entire ecosystems and can have substantial adverse effects on the environment. It is known to poison monarch butterflies and their habitat and contaminate water supplies and wildlife through runoff and spray drift. 2,4-D produces toxic effects on crops, plants, pollinators, birds, and other species. "2,4-D drift is responsible for more episodes of crop injury than any other pesticide."[8]

[82] Direct contamination occurs from applications on target crops and non-target plants, and additional indirect contamination occurs via spray drift, vapor drift, runoff, erosion, and other routes of exposure by which 2,4-D moves around and contaminates non-target environments, including crops and plants grown on neighboring lands. 2,4-D products adversely affect the survival, growth, and reproduction of individual plants and animals that are exposed directly or via spray drift or runoff, such as mammals, birds, bats, fish, amphibians, and pollinators, as well as plants that provide important habitat for nearby wildlife. Bees are directly exposed to 2,4-D when they forage from contaminated plants. 2,4-D harms terrestrial vertebrates (mammals, birds, amphibians, and reptiles), terrestrial invertebrates (including bees and monarch butterflies), and terrestrial plants.

[83] In 2016 the NRDC declared 2,4-D "The Most Dangerous Pesticide You Never Heard

---

[7] Delvalle, Tanner. "Using Proper Herbicide Formulations to Prevent Damage." PennState Extension, October 29, 2025. Available at https://extension.psu.edu/using-proper-herbicide-formulations-to-prevent-damage. See also Aldrich-Markham, Susan. "Warm weather sends herbicides drifting into trouble." Oregon State University Newsroom, July 21, 2009. Available at https://new.oregonstate.edu/news/warm-weather-sends-herbicides-drifting-trouble, recommending herbicide application only when temperatures will remain under 75F.

[8] "'Agent Orange' Crops: The Next Stage in the Chemical Arms Race," Center for Food Safety, January 2014. Infographic available at https://www.centerforfoodsafety.org/fact-sheets/2873/agent-orange-crops-the-next-stage-in-the-chemical-arms-race.



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

Of."[9] "Numerous studies link 2,4-D exposure to major health problems such as cancer, lowered sperm counts, liver disease and Parkinson's disease. Studies have also shown that 2,4-D adversely affects the hormonal, reproductive, neurological, and immune systems."[10] The World Health Organization's International Agency for Research on Cancer concluded that 2,4-D is possibly carcinogenic to humans.[11] Studies have shown a connection between 2,4-D and non-Hodgkin lymphoma.[12] "Studies show that children exposed to pesticides suffer elevated rates of leukemia, brain cancer, and soft tissue sarcoma."[13] A study from the UC San Diego Herbert Wertheim School of Public Health and Human Longevity Science released in 2023 found that exposure to 2,4-D was associated with worse brain function among adolescents; 2,4-D was negatively associated with performance in all five neurobehavioral areas, but statistically significant associations were observed with attention and inhibitory control, memory and learning, and language.[14]

---

[9] Sedbrooke, Danielle. "2,4-D: The Most Dangerous Pesticide You've Never Heard Of." NRDC, March 15, 2016. Available at https://www.nrdc.org/stories/24-d-most-dangerous-pesticide-youve-never-heard.

[10] See footnote 8.

[11] "DDT, Lindane and 2,4-D," *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans Volume 113*. IARC Publications, 2018.

[12] Agency for Toxic Substances and Disease Registry (ATSDR). "Toxicological Profile for 2,4-D." CDC, U.S. Department of Healthy and Human Services, 2020. Available at https://wwwn.cdc.gov/tsp/ToxFAQs/ToxFAQsDetails.aspx?faqid=1501&toxid=288. See also Kogevinas, Manolis et al. "Soft Tissue Sarcoma and Non-Hodgkin's Lymphoma Workers Exposed to Phenoxy Herbicides, Chlorophenols, and Dioxins: Two Nested Case-Control Studies," *Epidemiology*, July 1995, Volume 6 Number 4.

[13] Ma, X. et al. 2002, "Critical Windows of Exposure to Household Pesticides and Risks of Childhood Leukemia," *Environmental Health Perspectives* 110(9): 955-960; Zahm, S., et al. 1998 "Pesticides and Childhood Cancer." *Environmental Health Perspectives* 106(Supp. 3): 893-908.

[14] Yang, Kun, et al. "Urinary glyphosate, 2,4-D and DEET biomarkers in relation to neurobehavioral performance in Ecuadorian adolescents in the ESPINA cohort." *Environmental Health Perspectives*, October 11, 2023. Summary available at https://www.eurekalert.org/news-releases/1003778.



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

[84] 2,4-D can cause severe eye irritation, coughing, a burning feeling in the airway and dizziness. There is no antidote for 2,4-D poisoning and treatment is limited to supportive care, focusing on decontamination and stabilization measures in the event of a health crisis.

[85] "Nausea, dizziness, respiratory problems, headaches, rashes, and mental disorientation, may appear even when a pesticide is applied according to label directions. Pesticide exposure can adversely affect the neurological, respiratory, immune, and endocrine systems, even at low levels."[15]

[86] 2,4-D was developed as a chemical warfare agent under war-time secrecy during World War II, but not deployed at that time because the war ended prior to its planned deployment against Japan in 1946. 2,4-D was a primary component of Agent Orange, which was heavily sprayed during the Vietnam War[16] and is tied to birth defects and illness among Vietnam War veterans and the people of Vietnam, as well as environmental and ecological damage.

[87] The ester forms are not water-soluble and remain in the environment significantly longer than amine salt versions. The esters' persistent nature is one of the selling points of Crossbow, giving it much longer efficacy and persistence than the salt forms of 2,4-D.

[88] Triclopyr slowly kills plants by causing uncontrolled plant growth. The ester form of triclopyr causes eye irritation, teary eyes, skin irritation and respiratory tract irritation. It is a dermal sensitizer (causing allergic reactions after multiple exposures). Triclopyr exposure may also cause dizziness, drowsiness and gastrointestinal irritation and severe eye damage and acute exposure has also been linked to blood, kidney, liver, and nervous system toxicity

---

[15] Kagan Owens and Jay Feldman, "Getting the Drift on Chemical Trespass." *Pesticides and You*, Vol. 24, No. 2, 2004. Beyond Pesticides/National Coalition Against the Misuse of Pesticides.

[16] Part of the United State's rationalization for its use of Agent Orange during the Vietnam War was British use it of during the Malayan Emergency (1948-1960), which U.S. officials cited as precedent of its use in warfare.



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-4398

in animals and in experimental animal studies Triclopyr has been shown to cause reproductive and developmental abnormalities, including increased fetal death and skeletal malformations, as well as liver and kidney defects.[17]

[89] "Both fish and amphibian species have exhibited behavioral defects, reduced oxygen uptake and loss of motor control when exposed to low doses of triclopyr. At least one study has indicated that mammal populations dwelling in forested areas treated with triclopyr have been significantly reduced.... Additionally, triclopyr has been shown to disrupt the normal growth and nutrient cycling properties of microorganisms, fungi, mosses and algae; all of which perform critical functions to maintain a healthy ecosystem."[18]

[90] Triclopyr is so toxic that the Oregon Department of Agriculture advised Plaintiffs that no amount of Triclopy is safe in food and any crops with any amount of Triclopyr must be destroyed.

[91] Triclopyr can remain in dead vegetation for two years, and possibly longer.

[92] Crossbow contains so-called "inactive" ingredients, such as surfactants, defoaming and other chemical agents, which increase the overall toxicity of the product to human, animals, plants and other things. "Inactive" is not synonomous with "inert."

**C. Crossbow Cannot Be Legally Used**

[93] The conditions of urban and suburban residences make it impossible for these consumers to legally use Crossbow.

[94] When the EPA approved Crossbow Defendants' labels, it made federal law. The labels are the law governing the use of Crossbow. For example, the labels prohibit the application of Crossbow near or within 250 feet of residential areas. Some of the EPA-approved labels for Crossbow explicitly state that it is for non-residential use only.

---

[17] "Toxicological Profile for Triclopyr." Californians for Alternatives to Toxins. Available at https://www.alt2tox.org/tox_profile-triclopyr.htm.

[18] Ibid.



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

[95] The national median lot size for owner-occupied single-family homes in 2026 is approximately 10,871 square feet (roughly a quarter acre). Urban lots average under 5,000 square feet. Suburban lots run between 8,500 and 14,500 square feet. In the West the median lot size is 9600 square feet, median urban lot size 2,400 to 5,400 square feet and median suburban lot size 7,800 to 13,400 sq ft.[19] 41% of single-family homes built for sale and completed in 2025 had a lot size under 7,000 square feet.[20] The median lot size of a new single-family detached home sold in 2024 was 8,506 square feet, just under one-fifth acre.[21]

[96] In order to possibly use Crossbow and comply with the 250-feet restriction on its label, a property owner would have to have a lot large enough to encompass a circle with a 250-foot radius, which for a rectangular lot would require a square footage of over 250,000 square feet or 5.7 acres (however, this would only allow application in a one-foot square area at the very center). Given that the vast majority of residential lots are well under half an acre, Crossbow cannot be legally used in urban and suburban residential neighborhoods.

[97] The Church Lot, at 0.39 acres, has no place where Crossbow could be legally applied.

[98] Portland, in particular, is known for the high numbers of residents who grow their food, with backyard and frontyard tomatoes growing on practically every residential block. Just within ¾ mile of the Mouraveiko property are at least three other keepers of honeybees, a property with two or three goats and at least one property with chickens, on top of numerous properties with fruits, vegetables, ornamentals and flowers.

**D. The Church Defendants**

[99] Since acquiring the Church Lot Church Defendants have repeatedly expressed to

---

[19] See https://ownperch.com/guides/understanding-average-yard-sizes-in-the-united-states, which is based on numbers taken from US Census Bureau's American Housing Survey.

[20] "Highlights of 2025 Characteristics of New Housing" U.S. Department of Housing and Urban Development.

[21] "Lot Sizes Are Getting Smaller," *National Mortgage Professional*. Available at https://nationalmortgageprofessional.com/news/lot-sizes-are-getting-smaller.



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

Plaintiffs, often with hostility, their dislike, distaste and antagonism toward Plaintiffs' trees, particularly the birch trees.

[100] In Winter 2023 Williams showed up after a winter storm with two children. It was icy. He walked almost to the south end of the parking lot on the Church Lot, stood there for some time, and then started jumping up and down, frantically trying to grab at Plaintiffs' birch trees. When he succeeded in grabbing parts of the birch trees, he aggressively ripped at them. The children brought him loppers and together the three of them started cutting and tearing and ripping at the birch trees indiscriminately.[22]

[101] On August 17, 2024, Church Defendants arrived en masse for what at first looked like some sort of social event. The event turned out to be aimed at landscaping and at attacking Plaintiffs' trees. They hacked at them and cut them and carried off the pieces. They reached over Plaintiffs' fence in doing so and were pushing on the fence and the locked gate, trying to get through it.

[102] When confronted, Church Defendants (including some John Does) acknowledged that they were damaging Plaintiffs' trees, pushing on the gate into Plaintiffs' property and that was their intent. One of the individuals, speaking for the group, threatened to get their attorney involved, because it was their property. Others had also stated that it was their property and acted accordingly. They stated they would "grab a lawyer," grab a ladder and chainsaw and cut everything.

[103] They knew prior that the fence was Plaintiffs' fence and stood wholly on the Mouraveiko Property and they further readily pointed out and understood that the Mouraveiko Property extended beyond the fence to the West, acknowledged that they saw the plainly visible pin marking where the property line was (marking that the property line was west of the fence), and that Plaintiffs' did not want them to tresspass or do anything with

[22] It literally looked like they were fighting the birches, evoking the story of Don Quixote tilting at windmills. Some of the birch trees were as tall as Plaintiffs' house.



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

the Mouraveiko Property. They also acknowledged they were grabbing boards from Plaintiffs' property.

[104] The following year, in another example, Church Defendants organized themselves in a group, composed of some same and some different John Does from the prior events, and mounted another attack on Plaintiffs' birches and fruit trees. At one point, as they were wielding their tools, cutting and slashing Plaintiffs' trees and plants adjacent to and right in front of one of Plaintiffs' beehives, the commotion greatly disturbed the honeybees. A short while later Plaintiffs'heard some yelping and observed two individuals running away from Plaintiffs' fence, with 3-4 bees flying around them. It was obvious that they got stung. They stayed away a short time, but then returned, keeping a distance, talking and gesticulating toward the birches and other of Plaintiffs' trees and the bees.

[105] That same year Plaintiffs observed that Church Defendants were cutting at and around a cotoneaster in full bloom and angrily complaining that there were so many bees on their cotoneaster plant.

[106] Another time in 2025 Plaintiffs observed some John Does waving a weed-whacker over their heads, trying to hit and whack at the birches. Plaintiffs overheard them loudly discussing Plaintiffs' honeybees, referring to them as wasps, and discussing what to do.

[107] In 2025 Mouraveiko, while in the sideyard of the Mouraveiko Property, addressed a woman after observing she had bumped another car when parking in the Church Lot. She immediately launched into a tirade about her dislike of Plaintiffs' birches and how the birches should be all gone.

[108] In February 2026 Church Defendants / John Does confronted Mouraveiko and demanded that Plaintiffs get rid of the birches and other trees on the Mouraveiko Property.

[109] Church Defendants, including various John Does, have consistently and repeatedly expressed their desire to harm the plants on the Mouraveiko Property.

[110] At no time did any of the Church Defendants have Plaintiffs' permission to do



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

anything to Plaintiffs' trees or other property or enter Plaintiffs' property in any way.

[111] Since Church Defendants acquired the Church Lot, Church Defendants have repeatedly approached Plaintiffs and their children, including on their private property, telling them to join their church or insisting that Plaintiffs let Plaintiffs' children to go to their church, even though Plaintiffs have clearly told them they have no interest. In fact, Plaintiffs asked them to leave them alone.

[112] In February 2024, Williams approached Mouraveiko while Mouraveiko was in the privacy of the Mouraveiko Property to promote the church and how they help, presumably, church members. Mouraveiko informed him that Plaintiffs were not interested and did not want to be bothered. Williams called across the fence to Mouraveiko again in March 2024 while Mouraveiko was in the privacy of the Mouraveiko Property, wanting to discuss the same.

[113] The solicitations have been repeated and aggressive, including leaving notes from Williams and trinkets at Plaintiffs' front door, barging past Plaintiffs' no trespassing sign to knock on Plaintiffs' front door even after Plaintiffs told them to leave them alone,[23] and intercepting Plaintiffs and their children when out for walks on the public street. Church Defendants also tried to woo Plaintiffs' children to enter the church building on the Church Lot with enticements of food and other things.

[114] Church Defendants and various Does were noticeably annoyed that Plaintiffs did not wish to discuss attending their services or their church matters.

[115] ORUPC is one church with many locations. ORUPC organizes and provides maintenance for the different properties that house its locations, including paving, landscaping, remodeling and other activities. ORUPC leadership supervises activities at the individual locations, including at The Life Church location. The Life Church is one of

[23] It got to the point that if Plaintiffs did not open the door, they would loudly bang on the door.



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

ORUPC's locations, designated one of its "mission" churches. Focuses of the ORUPC are expansion, the acquisition of new members and collecting money.

[116] ORUPC raises money through its church locations and spends money on its church locations, including but not limited to for "Real Estate/Loan," "Rental Remodel" and "Property Expense" purposes. ORUPC organizes, supervises and gives money to various Does at its various locations, including at The Life Church location. ORUPC manages and changes "the mindset and the expectation" of its church locations.

[117] Williams and Scott, together with other Church Defendants and Doe co-conspirators, conspired and formed a plan to deploy Crossbow in violation of law, which plan was executed on on July 4. When caught, they proceeded with obstruction and deception to hide from Plaintiffs what they had done with respect to the chemical, the chemicals used and all pertinent information to the dispersal of the chemical, including chopping down vegetation near Plaintiffs' fence that had been sprayed. On Plaintiffs' information and belief they engaged in discussion, planning, cooperation and execution of the deployment of Crossbow at the Church Lot on July 4 and Scott was in in telephonic communication via cellular phone with other Church Defendants on July 4 concerning the same.

[118] At alternate times Scott and Williams were listed as officers of Portland Life Church, the recorded landowner of the Church Lot. Williams and Scott hold leadership positions in ORUPC and received money at various times.

[119] On Plaintiffs information and belief some of the Does operate or participate in businesses related to home improvement and/or landscaping and regularly use The Home Depot as a source of information, tools and other products and supplies for their projects, including herbicides.

[120] Church Defendants have utilized herbicides on the Church Lot at least two times prior to the July 4 spraying of Crossbow. Church Defendants selected Crossbow specifically because it would cause injury to plants right away and over time. They chose the hottest and



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

driest time of year to deploy Crossbow, and thereby achieved Crossbow's maximum damaging effect. Church Defendants knew or should have know that deploying Crossbow in the manner, timing and location that they did would cause harm to people, animals, plants and the environment, but did it anyway and did cause and are causing such harm. Church Defendants acted with maliciously reckless disregard for the harmful and injurious effects Crossbow would have on the people, plants, animals and properties surrounding the Church Lot.

[121] Church Defendants knew that Plaintiffs intended to consume the fruits of their trees, and knew their malicious act of deploying Crossbow would cause injury, harm or death.[24]

**E. The Crossbow Defendants**

[122] The Home Depot advertises and recommends Crossbow "for extensive lawncare." Crossbow cannot be used for lawncare. By their nature and in common linguistic use "lawns" are areas covered by grass that are in direct proximity to a residence or structure typically used by people. The typical customer of The Home Depot would associate "lawns" with the grass outside their house. An estimated 80% of all single-family detached residences in the United States have lawns. Residential lawncare is an over $12 billion dollar market.[25] If lawns were an irrigated crop, they would be the largest in the United States -- three times larger than irrigated corn.[26]

[123] None of the EPA-approved labels that Plaintiffs are aware of include any instances of

---

[24] On at least one occasion, Mouraveiko specifically asked Church Defendants to leave the pear and cherry trees alone and to not take the pears. At other times some of the Church Defendants saw when Plaintiffs or their children had gone on the west side of the fence in order to harvest some of the fruit.

[25] Ahn, Sunjin et al. "Rethinking the traditional American lawn: Perspectives of U.S. households in a nationwide survey," *Urban Forestry & Urban Greening,* Volume 99, September 2024. Available at https://www.sciencedirect.com/science/article/abs/pii/S1618866724002589.

[26] Lindsey, Rebecca. "Looking for Lawns," *NASA Earth Observatory*, Nov 8, 2005. Available at https://science.nasa.gov/earth/earth-observatory/looking-for-lawns/.



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

the words "lawn" or "lawncare." Promoting Crossbow for lawncare would be in contravention to the label for at least two reasons: direct proximity to residences and direct proximity to others' properties, residences, crops or susceptible plants of others.

[124] The Home Depot indicates that the Area of Use for Crossbow includes "Driveway, Garden, Landscape Bed, Lawn, Patio." All of these areas are part of or immediately adjacent to residenccs, include or are immediately adjacent to fruiting, ornamental and other susceptible plants and include or are immediately adjacent to places where humans reside and spend time, therefore any recommendation to use Crossbow on them is contrary to the EPA-approved Crossbow labels. The Home Depot's representations that Crossbow may be used on driveways, gardens, landscape beds, lawns and patios is at the minimum false, misleading and bound to cause confusion.

[125] On its webpage advertising and selling Crossbow, Wilco claims that Crossbow has "No effect on grasses" and that it "leaves grasses unaffected!"

[126] Crossbow can severely damage or kill newly seeded or immature grass of any type and some grasses, like bentgrass, at any stage of maturity. Crossbow is not labeled for use on residential lawns, which are commonly referred to as "grass." The EPA-approved label for Winfield Crossbow (along with other EPA-approved Crossbow labels) states, among other things:

- "Do not use on bentgrass. Do not use on newly seeded grasses.... Do not reseed pastures within a minimum of three weeks after treatment."
- "Use Crossbow on CRP acres only when the perennial grasses are established. Conditions that stress grasses, such as drought, will increase potential for injury to the grasses."
- "Do not use on bentgrass or newly seeded grass."

[127] Wilco's claim that Crossbow does not affect grass is at the minimum false, misleading and bound to cause confusion. It is in direct contradiction to the EPA-approved



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

Crossbow labels. A typical consumer would understand Wilco's references to grass to refer to and include their residential lawn. Crossbow is a chemical specifically designed to poison and kill and is hazardous to humans, pets, wildlife (both terrestrial and aquatic, including pollinators). Any association of Crossbow with use on anything residential creates a false comfort to consumers that it is safe to use around their homes, families and pets, which it is not. The overall message creates a false sense of a product that is safe to use around people and anything that would be in a residential garden.

[128] On its website The Home Depot publishes and maintains a library of suggested uses by way of "user" testimonials, questions and answers, praises and other information for the benefit of Crossbow Defendants', including for marketing and selling Crossbow, that are contrary to the EPA-approved labeling for Crossbow. For example:

- "Neighbor had Virginia creeper growing wild in back if their property that kept coming into our yard.... I sprayed a second time 5 days later...."
- "This product is awesome for killing brush. I had a lot of pine tree sprouts growing after a new home construction."
- "Helpful lawn product for weed suppression."
- "Have used many types of weed killers in the past with disappointment. I have a 150 ft fence line with vines, weeds, saplings, etc. Nothing would do the job. Went to Home Depot and told the guy in frustration I needed something to kill a redwood tree in 5 minutes, something this side of nuclear waste. He laughed and handed me crossbow...."
- "Worked amazing on all the little oak tree shoots sprouting in my flower beds."
- "It did a phenomenal job on all weeds in the yard."
- "I had massive over growth, scottish rose, poison ivy, morning glory, grapevine, honeysuckle, tree of heaven, and it killed it all so i could rake it all out and burn it. It did kill the grass but thats okay itll grow back. The overgrowth was about to take over my house and had already taken over my fence line."



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

- "I had a quaking aspen taken out of my front yard, messy awful tree, and the sucker trees have come up all over the lawn.... I have NOT been diluting it, rather, wearing a pair of gloves, got a spray bottle, and gently spraying the suckers to keep it off the lawn. It is powerful, noxious stuff and works!"
- "Works great! I suggest this to everyne that asks me about our yard."
- "Works great on broadleaf weeds in lawn.... Not sure what some of the other reviewers are talking about, maybe they are just trying to trick people into not using it because they are anti chemical."
- Q: "Is this stuff safe on Lawn ?" A: "Yes. Surprisingly it only kills weeds (basically kinds of weeds) but not the grass. You can see results in 2-3 days."
- Q: "I have wild blackberry growing in my fairly new sodded lawn. Will this kill the blackberry without causing any damage to the centipede? When is the best time to apply?" A: "Thank you for your question. Crossbow will control wild blackberries...."
- "I used this in my yard to take down poison ivy, and other weeds that had growing through my chain link fence. It was very effective."

[129] This information creates the impression for the average consumer that Crossbow is suitable for their residential lawns and gardens and near their homes and appropriate to spray on or near their neighbors' homes and gardens, overwhelming them with positivity and a sense of safety about using Crossbow where it should not be applied. They also serve to bolster the confidence of those consumers who want to knowingly wield Crossbow in a manner contrary to law, with the reassurance that they are only going with the herd, that "everybody does it." These comments, answers and exhortations by other supposed community members overshadow and obscure the law governing Crossbow's restrictions and allowed uses and promotes and legitimizes improper, harmful and illegal uses, including using it undiluted.

[130] The Home Depot and Wilco publish descriptions promoting Crossbow that omit



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

pertinent and vital facts about Crossbow that are included on the EPA-approved labels for Crossbow. Among other things, these omissions include that Crossbow

- Presents hazards to humans, animals and the environment;
- Is subject to a 2004 court order enjoining use of it in portions of Oregon, Washington and California;
- Should not be applied near crops, residential areas, bodies of water and other sensitive areas, and that invisible drift can cause harm (on some labels specified as 250 feet);
- Should not come in contact with food or forage crops;
- May inhibit seed germination and plant growth;
- And anything along the lines of the statement from the label(s) "Do not apply under circumstances where spray drift may occur to food, forage, or other plantings that might be damaged or crops thereof rendered unfit for sale, use or consumption. Susceptible crops include, but are not limited to, cotton, okra, flowers, fruit trees, grapes (in growing stage), fruit trees (foliage), soybeans (vegetative stage), ornamentals, sunflowers, tomatoes, beans, and other vegetables, or tobacco. Small amounts of spray drift that may not be visible may injure susceptible broadleaf plants."

[131] These intentional omissions sow confusion and give a misleading appearance that Crossbow is "safer" and has much wider application than it actually does, and are substantially different from the information on the EPA-approved label.

[132] In line with The Home Depot's and Wilco's misrepresentations and omissions, Scott said Crossbow is not Roundup, apparently as a reassurance, with the implication (given all the negative news about Roundup and its ingredient, glyphosate) that it is better than that other cancer- and problem-causing Roundup/glyphosate product.[27] Scott claimed everybody

---

[27] The Home Depot also sells Roundup, containing primary active ingredient Triclopyr in its amine salt form at 0.122%, compared to Crossbow at 16.5% (over 135 times more). The salt formulations of Triclopyr do not come even close to the volatilization, staying power and migration properties of the ester forms, which can travel long distances through the air. To put that in perspective, to achieve an equivalent concentration of Triclopyr with Roundup as



Tim Mouravciko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

uses Crossbow, including the City of Portland, as reason why Church Defendants chose to use it.

[133] Scott said he used Crossbow from Wilco and that he went to Wilco and they told him to use Crossbow.

[134] The Home Depot and Wilco are instrumental among the Crossbow Defendants for marketing Crossbow to urban and suburban consumers, confusing them about Crossbow's uses, benefits, restrictions and harms, and establishing and promoting general, erroneous knowledge about the nature and uses of Crossbow among their community of customers, who are largely homeowners in urban and suburban areas, not the least by maintaining websites with intentionally confusing and/or misleading information about Crossbow.

[135] Southern Ag participates in propagating and promoting the message on The Home Depot's website, including by peppering The Home Depot's Crossbow content library with its own comments among, which bolsters and lends the weight of its authority to The Home Depot's published Crossbow content and thereby endorses and approves the off-label use of Crossbow in areas where it does not belong and in manner contrary to the label. Southern Ag further identifies and promotes Crossbow as a residential use and lawncare product on its own website, southernag.com, which is contrary to the EPA-approved label.

[136] Helena has sales locations throughout Oregon through which it sells Crossbow. It also directs callers, knowing that they are residential customers, for example, with a small yard in Portland, to purchase its Crossbow at The Home Depot, on The Home Depot's website, at Wilco and on Wilco's website.

[137] Winfield has a close relationship with Wilco. Together they conduct joint ventures.

---

he did with Crossbow, Scott would have to had used over 4300 lbs – the weight of a full-size SUV and enough to fill an 8-person hot tub and costing over $15,000 (and it still would have not delivered the same damage to Plaintiff, not even close). And yet, The Home Depot cautions that after Roundup nothing would grow for four months: "All ornamental bedding plants (annuals and perennials), trees, shrubs, sod and seed can be planted 4 months after application."



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

[138] Corteva has a past history of violations of illegal safety claims in advertising of its pesticides, including in 2003 when it was ordered to pay a $2 million court ordered penalty to the State of New York. At the time New York Attorney General explained "By misleading consumers about the potential dangers associated with the use of their products, Dow's[28] ads may have endangered human health and the environment by encouraging people to use their products without proper care." Corteva holds the original trademark and master label for Crossbow and works with Southern Ag, Winfield, Helena and others for licensed partner brands of Crossbow, marketing and distribution.

[139] Promotion of the off-label use of Crossbow increases Crossbow Defendants' sales and profits, particularly in light of the huge market that lawncare in the United States has become.

**F. Public Interest**

[140] Simply going by its label restrictions, Crossbow is a niche product not suitable for use in most places nor for use by the vast majority of homeowners. It is not for use on or near crop areas. It is not for use in or near residential areas. It is not for use in timber areas. It is not for use on or near nurseries that raise plants for sale. It is not for use in commercial seed production. It is not for use near bodies of water or areas near surface water. "The use of this chemical in areas where soils are permeable, particularly where the water table is shallow, may result in groundwater contamination."[29]

[141] The question is, where can this product be used? In short, where nothing grows, i.e. industrial deserts where people do not work, provided they are far enough away from crop areas, residential areas, bodies of water, timber areas and a lot of other areas. In Oregon, at least, that does not encompass a lot of places. Not in Oregon's urban and suburban areas and

---

[28] Corteva was formerly known as Dow, Dow Chemical and Dow Agroscience.

[29] EPA-approved Southern Ag Crossbow label, which is echoed closely, if not exactly, by other EPA-approved Crossbow labels.



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

not in many of Oregon's rural, agricultural areas. Oregon's farmers are in the business of growing stuff, not killing stuff.[30]

[142] Yet Crossbow is casually available for sale at urban and suburban retailers like Wilco, The Home Depot and others and its illegal use promoted by Crossbow Defendants. Over the years Crossbow Defendants embedded knowledge, including for non-peaceful purposes, about a product that could be used as a chemical weapon. This is harm that cannot be undone for as long as they continue selling it to residential consumers. That presents unique harm to Plaintiffs and others, as anyone on the block can go out and get Crossbow. Plaintiffs are afraid that they will be subject to its harms again.

[143] It is against public interest to allow the illegal promotion of Crossbow for illegal uses. Crossbow Defendants profit nicely from placing Crossbow in the hands of people who cannot use it legally, who spread it far and wide. Once dispersed, one container of Crossbow can directly affect up 30-40 residential properties with collective values of an estimated 10-30 million dollars, which with an average occupancy of three people means 90-120 individual people harmed, in addition to their properties and domestic animals. All of that harm, so Crossbow Defendants can potentially get $30 per sale.

[144] Unfortunately, there is no way for homeowners to get away from Crossbow. Once it has been dispersed it will affect them and their properties. The chemical is invisible, elusive, yet harmful and persistent – it will continue harming for a long time. For the vast majority of the United States, their home is their biggest asset. Deploy something like Crossbow on them

---

[30] Oregon leads the nation in production of hazelnuts and grass seed and is a top producer of berries, onions, cherries, hops and potatoes. Greenhouse and nursery stock (flowers, ornamental shrubs and trees, fruiting shrubs and trees and vegetable starts) are Oregon's highest earning agricultural commodity. Other products like milk, hay for fodder, grapes and vegetables are also important. Crossbow cannot be used on any of these products without causing harm; lactating animals may not graze on Crossbow-treated pastures until the following season. Oregon farmers suffer from Crossbow – it is the thing that kills their profits and the fruits of their hard work – just a whiff of its invisible vapor originating from a stupid or malicious customer of Crossbow Defendants means injury to plants, crops, livelihoods, human health and livestock.



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

and they have nowhere else to go – they cannot abandon their home, but what are they to do? Few have the resources to plunge into a full-scale remediation. One application of Crossbow, and up to 30-40 homeowners have no escape – their local The Home Depot and Wilco stores and other Crossbow Defendants have brought the Vietnam War to their backyard.

[145] Unless the culprit is caught red-handed, homeowners will have no clue what hit them.

[146] What is worse for Oregon is that Oregon summers are too dry and hot for Crossbow. As Oregon agronomists warned decades ago, at temperatures of 75 F and above it volatilizes and travels on the air currents very well. An application in early summer would rise and fall with the temperature, cycling from day to night and volatilizing and spreading with every cycle. As Plaintiffs' experienced themselves, a little bit of misty or light rain re-energizes the Crossbow esters and with the warming day rises back up in the atmosphere with the water vapor, much stronger than the day before.

[147] From casual observation of the quantities posted as available in the Portland area The Home Depot stores, The Home Depot alone goes through at least 1000 to 2000 containers of Crossbow a week, but there simply are not thousands of properties in the Portland area that are large enough or far away enough from residences, crops, bodies of water, timber and other areas labeled to be avoided for Crossbow to be legally used on them.

[148] Yet Crossbow Defendants facilitate and promote its use precisely in those areas where it cannot be used. Don't like your neighbor? There's a Crossbow for that.[31] Don't want to dig the weeds/blackberries/other plants out of your garden? There's a Crossbow for that.[32] Just want everything dead? There's Crossbow for that, too.[33] As Scott said, and the Crossbow

---

[31] From The Home Depot website: "Neighbor had Virginia creeper growing wild in back if their property that kept coming into our yard.... In 2 days, everything i sprayed was starting to wilt."

[32] From The Home Depot website: "Sprayed (2oz to a gallon of water) directly on the leaves of the blackberries & the Next day they were wilting and the grass around them was perfectly fine...."

[33] From The Home Depot website: Q: "I want to kill every plant in an old garden. Grasses,



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

Defendants promote, continue killing.

**FIRST CLAIM FOR RELIEF**

**(Strict Liability ORS 30.920 – against Wilco, Helena, Corteva and John Doe Mfg)**

[149] Plaintiffs reallege and incorporate by reference all those allegations set forth above and below as though fully set forth herein.

[150] Crossbow is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

[151] By its design Crossbow is a product sold in a defective condition unreasonably dangerous in the meaning of ORS 30.920. Due to its design defects Crossbow is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. For example, an ordinary consumer with ordinary knowledge common to the community would not expect that an application of Crossbow on one property would injure the trees, plants and other vegetation on a different property, whether near or distant, nor sicken, make unwell or cause discomforts to his or her neighbors. An ordinary consumer with the ordinary knowledge common to the community would not expect that Crossbow, labeled as "low volatile," would volatilize and spread, visibly or invisibly, from its original site of application at all, let alone for weeks and months after application.

[152] Wilco's marketing and informational materials on its website and its personalized recommendations to Scott regarding the use and dangers of using Crossbow were at a minimum false, incorrect and inadequate and further rendered Crossbow unreasonably dangerous. Wilco has knowledge, or by the application of reasonable, developed human skill and foresight should have had knowledge of the dangers of Crossbow to Plaintiffs and others. The harm that befell Plaintiffs was forseeable, or should have been forseeable to

---

weeds, and all...." A: "Crossbow is a 'specialty' herbicide that controls heavy brush, hard to control vines and broadleaf weeds...."



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

Wilco.

[153] Wilco, Helena, Corteva and John Doe Mfg are engaged in the business of selling, distributing, designing, licensing and/or manufacturing Crossbow and are liable for the harm and injury done to Plaintiffs.

[154] Plaintiffs are entitled to property, economic and non-economic damages of $32,000,000, with the exact amount to be determined at trial, and their costs.

**SECOND CLAIM FOR RELIEF**

**(Timber Trespass ORS 105.815 – against Church Defendants)**

[155] Plaintiffs reallege and incorporate by reference all those allegations set forth above and below as though fully set forth herein.

[156] Church Defendants had no lawful authority, no permission, no consent and no legal right to injure or do anything at all to the produce, trees and shrubs located on the Mouraveiko Property, nor enter the Mouraveiko Property. Church Defendants willfully, intentionally and maliciously injured the produce, trees and shrubs on the Mouraveiko Property, including through their application of Crossbow.

[157] Church Defendants' actions rendered all produce on the Mouraveiko Property unharvestable, unfit for consumption and unusable, in some cases for the next three, five and ten years, depending on the type of produce.

[158] Church Defendants' actions have diminished the property value of the Mouraveiko Property. Immediately upon Church Defendants' dispersal of Crossbow the Mouraveiko Property's value either dropped to zero or became negative, in fact creating a liability for Plaintiffs.

[159] Immediately upon Church Defendants' dispersal of Crossbow, which is the cause of the injury to the trees and shrubs on the Mouraveiko Property, the Mouraveiko Property became unsellable and its diminishment in value unascertainable.

[160] Damages due to the diminishment of value of the Mouraveiko Property are in excess



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

of $1,059,900, to be determined at trial.

[161] Damages due to the cost of remediation of the timber trespass injury, which includes removal and replacement of the injured trees and shrubs, is in excess of $1,500,000.

[162] Damages due to the injury to the crops on the Mouraveiko Property is in excess of $230,000.

[163] Under ORS 105.815 Plaintiffs are entitled to treble damages, attorney fees and costs. In the alternative Plaintiffs are entitled to double damages under ORS 105.810 or actual damages, plus attorney fees and costs.

**THIRD CLAIM FOR RELIEF**

**(RICO – against The Home Depot, Wilco, Winfield, Helena, Corteva and Southern Ag)**

[164] Plaintiffs reallege and incorporate by reference all those allegations set forth above and below as though fully set forth herein.

[165] The Home Depot, Wilco, Southern Ag, Winfield, Helena and Corteva and their unnamed co-conspirators constitute an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that they are "a group of individuals associated in fact" (hereinafter "Crossbow Enterprise"). The members of the Crossbow Enterprise share the common purpose, among others, of advancing, facilitating, furthering and profiting from the sale of Crossbow for use in residential areas where its use is unlawful and for unlawful purposes. The members of the Crossbow Enterprise are related in that they, among other things, have knowingly assisted or induced persons to violate 18 U.S.C. § 229(a)(1)[34] or conspired with and facilitated others to do so.

[166] This is an indictable criminal offense, because Crossbow is a "chemical weapon" and "toxic chemical" as defined in 18 U.S.C. §§ 229F(1)(a) and (8)(a).[35] Crossbow is a toxic

---

[34] Under 18 U.S.C. § 229(a)(1) it is unlawful for any person knowingly to use any chemical weapon or assist or induce, in any way, any person to otherwise acquire, receive, retain, own, possess, or use, or threaten to use any chemical weapon.

[35] Under 18 U.S.C. § 229F(1)(A) "chemical weapon" means "A toxic chemical ... except



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

chemical hazardous to humans and animals. The use of Crossbow in residential areas, near areas occupied by humans or animals, or on edibles or food crops in any quantity is inconsistent with any peaceful purpose. These and residential use of Crossbow does not fall under any of the chemical weapons exceptions.

[167] The Crossbow Enterprise members knew or should have know that they were selling Crossbow to residential consumers who would have been indictable under federal law for deploying a toxic chemical not for peaceful purposes, i.e., as a chemical weapon, and under state law. The Crossbow Enterprise members knew or should have known that the actual legal use for Crossbow is de minimus, and that non-peaceful use was the primary purpose of their sales. They knew or should have known that they were placing chemical weapons in the hands of either nefarious, misguided, reckless or stupid individuals and that all of their sales through the channels of the Crossbow Enterprise from manufacturer to distributor to retailer would all be indictable for chemical weapons violations.

[168] In order to carry out or attempt to carry out their scheme, the members of the Crossbow Enterprise conducted or participated in the conduct of the affairs of that enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud). Specifically, the members of the Crossbow Enterprise participated in the scheme to assist and induce residential use of Crossbow by using mail, telephone, and the Internet to transmit writings travelling in interstate or foreign commerce that promoted, encouraged and normalized the illegal use of Crossbow in residential areas. The Crossbow Enterprise members' use of the mails and wires include, but are not limited to the transmission, delivery, or shipment of the

---

where intended for a purpose not prohibited under this chapter as long as the type and quantity is consistent with such a purpose." Under 18 U.S.C. § 229F(8)(A) the term "toxic chemical" means any chemical which through its chemical action on life processes can cause death, temporary incapacitations or permanent harm to humans or animals. The term includes all such chemicals, regardless of whether they are produced in facilities, in munitions or elsewhere."



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

following by the members or third parties that were foreseeably caused to be sent as a result of the Crossbow Enterprise members' illegal scheme:

- Crossbow to residential addresses and residential users across the United States;
- Documents and communications promoting illegal uses of Crossbow;
- Sales and marketing materials, including advertising and websites, which misrepresented and mischaracterized the allowed uses of Crossbow;
- Documents intended to facilitate the sale and distribution of Crossbow, including invoices, shipping records, reports and correspondence;
- Documents to process and receive payment for Crossbow, including invoices and receipts;
- Payments to Crossbow Enterprise members;
- Deposits of proceeds from sales of Crossbow by Crossbow Enterprise members;
- Other documents and things, including electronic communications.

[169] The Crossbow Enterprise members utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described therein. The Crossbow Enterprise members also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships, and other third-party entities in furtherance of the scheme.

[170] The mail and wire transmissions described herein were made in furtherance of the Crossbow Enterprise members' scheme and common course of conduct in order to misrepresent and confuse consumers about the approvals, characteristics and certifications of Crossbow, promote illegal use of Crossbow, assist and induce the use of Crossbow as a chemical weapon, and to effectuate and profit from the purchase of Crossbow that Crossbow Enterprise members sold and distributed.

[171] Many of the precise dates of the fraudulent uses of U.S. Mail and interstate wire



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

facilities are not publicy available and cannot be alleged without access to the Crossbow Enterprise members' books and records, however, the types thereof, and in some instances, examples of the predicate acts of mail and/or wire fraud occurred have been described herein. They include numerous communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

[172] The Crossbow Enterprise members have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. Various other persons, including persons not named as defendants in this Complaint, have participated as co-conspirators with the Crossbow Enterprise members in these offenses and have performed acts in furtherance of the conspiracy to induce and assist illegal use of Crossbow, including as a chemical weapon, in order to increase or maintain revenues, profits and/or market share for the Crossbow Enterprise members and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

[173] Under 18 U.S. Code § 1961 racketeering activity includes "any act which is indictable under any of the following provisions of title 18, United States Code ... sections 229–229F (relating to chemical weapons)." The Crossbow Enterprise members aided and abetted others in the violations of 18 U.S.C. § 229(a)(1), thereby rendering them indictable as principals.

[174] The Crossbow Enterprise members, with knowledge and intent, have in common the overall objectives of the Crossbow Enterprise and participated in the common course of conduct to commit the prohibited acts of assisting and inducing the use of Crossbow as a chemical weapon. The Crossbow Enterprise members' conduct in furtherance of this scheme was intentional. Plaintiff and others were harmed as a result of the Crossbow Enterprise members' intentional conduct.

[175] As described herein, the Crossbow Enterprise members engaged in a pattern of related and continuous predicate acts for numerous years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of inducing and



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

assisting with the use of Crossbow as a chemical weapon in residential areas and other areas and obtaining significant monies and revenues from them and through them while providing Crossbow. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

[176] The Crossbow Enterprise members had a duty to not induce or assist in the use of Crossbow as a chemical weapon. The Crossbow Enterprise members had a duty to not publish or communicate anything about Crossbow contrary to the EPA-approved labeling for Crossbow to consumers and others, but they failed to do so. The EPA-approved label for Crossbow is the law and it applies to users, sellers, distributors and manufacturers of Crossbow and claims made about Crossbow by any of the Crossbow Enterprise members are not allowed to substantially differ from those claims approved through the EPA registration process. Under 7 U.S.C. § 136j(a)(1)(B) it is unlawful for anyone to sell or distribute to any person "any registered pesticide if any claims made for it as a part of its distribution or sale susbtantially differ from any claims made for it as a part of the statement required in connection with its registration...." The EPA specifically warned Corteva against this type of conduct in 2009. The others Crossbow Defendants knew or should have known the same.

[177] The Crossbow Enterprise members' violations of the RICO statute and 18 U.S.C. § 229 have directly and proximately caused injuries and damages to Plaintiffs. Each member of the Crossbow Enterprise knew, understood, and intended to increase its sales of Crossbow by inducing and assisting with the use of Crossbow as a chemical weapon, knowing that it could injure Plaintiffs and other residents of residential areas and the actions of the Crossbow Enterprise did injure Plaintiffs, their family and their property.

[178] As a result of the conduct of the Crossbow Enterprise, Plaintiffs have been injured in their business and their property. They have suffered damages to their private property, to business ventures and, because exposure to Crossbow interfered with Plaintiffs' ability to pursue business opportunities and development. It caused Plaintiffs to feel sick and unwell to



Tim Mouravciko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

the extent that they were unable to work at their normal employments and business ventures, thereby they were delayed and denied the ability to profit from their normal employments and business ventures, among other things.

[179] Plaintiffs suffered property and business losses of $32,000,000, with the exact amount to be determined at trial. Plaintiffs are entitled to treble damages under the RICO statute, plus attorney fees and costs.

**FOURTH CLAIM FOR RELIEF**

**(UTPA / ORS 646.608 – against The Home Depot, Wilco and Southern Ag)**

[180] Plaintiffs reallege and incorporate by reference all those allegations set forth above and below as though fully set forth herein.

[181] A person engages in an unlawful practice if in the course of the person's business the person "[c]auses likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of real estate, goods or services" or "[r]epresents that real estate, goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that the real estate, goods or services do not have...." ORS 646.608(1)(b) and (e).

[182] Crossbow is a good under the meaning of ORS 646.608.

[183] In the normal course of its business The Home Depot engages in unlawful business practices both by causing likelihood of confusion or misunderstanding about the approval or certification of Crossbow and by representing that Crossbow has approval, characteristics, uses, or qualities that it does not have. This includes by publishing materials on its website, including in product descriptions, specifications, user testimonials and Q&As, that are contrary to the EPA-approved labeling for Crossbow that endorse, promote or suggest that Crossbow is appropriate for use in residential settings, and also by omitting information listed on the EPA-approved Crossbow label that is materially relevant and vital about Crossbow's restrictions, approvals and uses and thereby making the claims The Home Depot



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

made on its website about Crossbow materially different from the information printed on the EPA-approved label, among other things. Crossbow is not appropriate or approved for residential use, including not on residential lawns, among many other things.

[184] In the normal course of its business Wilco engages in unlawful business practices both by causing confusion and misunderstanding about the approval and certification of Crossbow and by representing that Crossbow has approval, characteristics, uses, or qualities that it does not have. This includes by publishing materials on its website, including in product descriptions, that are contrary to the EPA-approved labeling for Crossbow that endorsed, promoted or suggested that Crossbow is appropriate for use in residential settings, such as for use on grass, among other things, and also by omitting information listed on the EPA-approved Crossbow label that is materially relevant and vital about Crossbow's restrictions, approvals and uses and thereby making the claims Wilco made on its website about Crossbow materially different from the information printed on the EPA-approved label, among other things. Crossbow is not appropriate or approved for residential use, including not on residential lawns, among many other things.

[185] Under 7 U.S.C. § 136j(a)(1)(B) it is unlawful for anyone to sell or distribute to any person "any registered pesticide if any claims made for it as a part of its distribution or sale susbtantially differ from any claims made for it as a part of the statement required in connection with its registration...." Every time EPA reviews and approves the label for a registered pesticide, it is making federal law; as the EPA has long declared, "the label is the law." The EPA advises those applying for pesticide label registration that "regardless of whether a website is referenced on your product's label, claims made on the website may not substantially differ from those claims approved through the registration process." This applies to users, sellers, distributors and manufacturers of Crossbow, including the claims made about Crossbow by The Home Depot and Wilco.

[186] The claims made by The Home Depot and Wilco as part of the distribution and sale



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

of Crossbow that differ from the EPA-approved labels are illegal under federal law and certainly the type of misrepresentation or confusion causing actions contemplated under ORS 646.608. In omitting vital information from the EPA-approved label in their published descriptions of Crossbow, The Home Depot and Wilco made improper and misleading representations about Crossbow and sowed confusion and misunderstanding about Crossbow's approval and certification.

[187] Southern Ag participates in maintaining and creating The Home Depot's library of Crossbow content and fails to correct material misrepresentations and participates in material omissions that inform consumers decisions to purchase Crossbow. On its own website Southern Ag promotes the use of Crossbow in residential areas and for lawncare, directly contrary to its own EPA-approved label. Southern Ag has a legal duty to disclose that Crossbow is not for use in residential areas and not on lawns, yet it promotes Crossbow for precisely those uses.

[188] In the normal course of its business Southern Ag engaged in unlawful business practices both by causing likelihood of confusion or misunderstanding about the approval or certification of Crossbow and by representing that Crossbow has approval, characteristics, uses, or qualities that it does not have. Southern Ag actively participates in content generation on The Home Depot website concerning Crossbow and clearly caused confusion and misunderstanding about the approval and certification of Crossbow and represented that Crossbow has approval, characteristics or certifications that it does not by posting and otherwise publishing materials on The Home Depot website that are contrary to the EPA-approved labeling for Crossbow.

[189] These deceptive trade practices materially contributed to Church Defendants use of Crossbow in manner in violation of federal and state law and resulted in Plaintiffs' direct, ascertainable losses.

[190] Plaintiffs have suffered ascertainable losses in an amount not to exceed $5,000,000, to



Tim Mouravciko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

be determined at trial, or $200 per incident, whichever is greater, and are entitled to their attorney fees and costs, and punitive damages to be determined at trial.

**FIFTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS**

**(Civil Conspiracy – against Church Defendants)**

[191] Plaintiffs reallege and incorporate by reference all those allegations set forth above and below as though fully set forth herein.

[192] A civil conspiracy in Oregon is a combination of two or more persons who by concerted action accomplish an unlawful purpose, or accomplish some purpose not in itself unlawful by unlawful means.

[193] Church Defendants, including John Does, constitute two or more persons. They wished to harm or have the result or preceived benefit from harming Plaintiffs' birches and other trees, among other things. They had a meeting of the minds about the desirability of harming Plaintiffs' birches and other trees or of the results or perceived benefits of doing so. They had a meeting of the minds about the desirability of applying herbicides that they knew or should have known would injure Plaintiffs trees, or of the results or perceived benefits of doing so. They had a meeting of the minds about the desirability of applying Crossbow, which they knew or should have known would injure Plaintiffs trees, or of the results or perceived benefits of doing so. Their application of Crossbow on July 4 was unlawful, as well as Church Defendants' prior activities. Plaintiffs, their family and their property were harmed as a proximate result of Church Defendants' unlawful activities, among other things.

[194] Plaintiffs have suffered damages in the amount of $32,000,000, to be determined at trial.

**SIXTH CLAIM FOR RELIEF**

**(Nuisance – against Church Defendants)**

[195] Plaintiffs reallege and incorporate by reference all those allegations set forth above and below as though fully set forth herein.



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

[196] A nuisance is an unreasonable non-trespassory interference with another's private use and enjoyment of land.

[197] Among other things, Church Defendants' conduct caused and continue to cause a chemical contamination of the Mouraveiko Property, which created a nuisance and unreasonably interfered with and impaired Plaintiffs' use and enjoyment of the Mouraveiko Property. As a result of the nuisance created by Church Defendants Plaintiffs will continue to fear for their and their childrens' health, welfare and safety and have a reasonable apprehension of danger to their persons and property. The nuisance, if unabated will continue to threaten Plaintiffs' health, welfare and peace of mind and prevent them from their private use and enjoyment of their land. As a material, foreseeable and proximate result of Church Defendants' conduct, the Plaintiffs have suffered actual injury and damages, both economic and noneconomic.

[198] Plaintiffs have suffered damages in the amount of $10,000,000, to be determined at trial.

**SEVENTH CLAIM FOR RELIEF**

**(Nuisance Per Se – against Church Defendants)**

[199] Plaintiffs reallege and incorporate by reference all those allegations set forth above and below as though fully set forth herein.

[200] Under ORS 466.640 "Any person owning or having control over any oil or hazardous material spilled or released ... shall be strictly liable without regard to fault." Under ORS 465.527 property owners, operators and contributors (any person whose actions or choices caued, added to or made the hazardous release worse) are liable for cleanup and remediation of the spill or release of the hazardous material.

[201] Crossbow is a hazardous material. Church Defendants caused it to be released and create a nuisance on and to the Mouraveiko Property.

[202] The EPA-approved label for Crossbow is the law. Church Defendants' broke the law



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

when they did not follow the restrictions and instruction on the EPA-approved label, including their application of Crossbow in a residential area and within 250 feet of Plaintiffs' residence, crops and susceptible plants, shrubs and trees and created the nuisance.

[203] Per ORS 634.372(4) a person may not "[p]erform pesticide application activities in a faulty, careless or negligent manner."

[204] By performing their pesticide application activities in a faulty, careless or negligent manner, Church Defendants broke the law, caused Crossbow to be released on and harm Plaintiffs, Plaintiffs' family and Plaintiffs' property and created a nuisance.

[205] As a material, foreseeable and proximate result of Church Defendants' conduct, the Plaintiffs have suffered actual injury and damages. both economic and noneconomic. Plaintiffs have suffered damages in the amount of $10,000,000, to be determined at trial.

**EIGHTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS**

**(Negligent Infliction of Emotional Distress – Church Defendants)**

[206] Plaintiffs reallege and incorporate by reference all those allegations set forth above and below as though fully set forth herein.

[207] Church Defendants' conduct unreasonably created a forseeable risk to Plaintiffs' and their childrens' health and caused injury to Plaintiffs' and their childrens' health. This has caused and continues to cause Plaintiffs emotional distress.

[208] Church Defendants' conduct unreasonably created a foreseeable risk to Plaintiffs' protected interests. Private property rights are one of the most fundamental protected interests in the United States, as are the right to bodily security and safety.

[209] Church Defendants' invasion of Plaintiffs' protected interests in their own and their family's health and their property understandably caused emotional distress and suffering to Plaintiffs that is still ongoing.

[210] Plaintiffs have suffered damages in the amount of $10,000,000, to be determined at trial.



Tim Mouravelko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

**NINTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS**

**(Intentional Infliction of Emotional Distress – against Church Defendants)**

[211] Plaintiff realleges and incorporates by reference all those allegations set forth above and below as though fully set forth herein.

[212] Church Defendants knew with substantial certainty that their conduct would cause severe emotional distress and intended to cause Plaintiffs severe emotional distress. See, for example, Scott's refusal to stop the application of Crossbow and comment that he would continue "killing" after Plaintiffs objected to him applying Crossbow and pointing out that it was poisonous.

[213] Church Defendants engaged in outrageous conduct by violating federal and state laws, including the chemical weapons statutes. Church Defendants engaged in outrageous conduct, beyond the bounds of socially tolerable behavior by employing an extremely inappropriate, harmful and illegal weed control method that could and did and continues to contaminate and damage Plaintiffs' property and injure Plaintiffs and their family personally. Church Defendants conduct caused Plaintiffs severe emotional distress that is still ongoing.

[214] Plaintiffs have suffered damages in the amount of $10,000,000, to be determined at trial.

**TENTH CLAIM FOR RELIEF**

**(Negligence – against Church Defendants)**

[215] Plaintiffs reallege and incorporate by reference all those allegations set forth above and below as though fully set forth herein.

[216] The Church Defendants have a duty to exercise ordinary and reasonable care in applying chemicals or other hazardous materials on and around the Church Lot, particularly to avoid dispersing any chemical into the air or beyond the bounds of the Church Lot. In using Crossbow, Church Defendants were derelict in their duty to exercise ordinary and reasonable care, because, among other things, Crossbow is not for residential use, liable to



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

drift, volatilizes and travels away from the site of application weeks and months after initial application, causing harm and injury to non-target plants and vegetation. Further, Church Defendants released Crossbow into the air on a windy day within 250 feet of residences, pollinators, non-target crops, ornamental plants and people.

[217] Plaintiffs objected to Church Defendants' release and dispersal of Crossbow, pointing out that it was causing harm to them and their bees, but Church Defendants nevertheless continued to release and disperse Crossbow without exercising any reasonable care.

[218] Church Defendants' negligence is the material and proximate cause of damages and injuries to Plaintiffs, both economic and noneconomic. Plaintiffs have suffered damages in the amount of $10,000,000, to be determined at trial.

## ELEVENTH CLAIM FOR RELIEF

### (Negligence Per Se – against Church Defendants)

[219] Plaintiffd reallege and incorporate by reference all those allegations set forth above and below as though fully set forth herein.

[220] Church Defendants violated the law by failing to adhere to the lawful restrictions and instructions of the EPA-approved Crossbow label. These violations of federal law are proximate cause of the injuries and damages Plaintiffs sustained and continue to sustain, which damages and injuries are of the type the EPA-made law of the Crossbow label was intended to prevent. Church Defendants violated the law "[p]erform[ing] pesticide application activities in a faulty, careless or negligent manner." ORS 634.372(4).

[221] As a material, foreseeable, and proximate result of Church Defendants' conduct, Plaintiffs have suffered actual injury and damages, both economic and noneconomic. Plaintiffs have suffered damages in the amount of $10,000,000, to be determined at trial.

## TWELFTH CLAIM FOR RELIEF

### (Gross Negligence – against Church Defendants)

[222] Plaintiff realleges and incorporates by reference all those allegations set forth above



Tim Mouravciko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

and below as though fully set forth herein.

[223] Church Defendants acted with extreme carelessness and reckless disregard for the known dangers and foreseeable risks of the application and dispersal of Crossbow in July 4, 2026. They completely failed to exercise even a minimal amount of care and exhibited a conscious and voluntary indifference to the probable consequences of their actions.

[224] Church Defendants' reckless and unlawful conduct has materially harmed Plaintiffs to a level above the normal and usual peril expected from living in a residential neighborhood. The damages and harm Plaintiffs experienced and continue to experience, both economic and noneconomic, are material, foreseeable and proximate results of Church Defendants' gross negligence.

[225] Plaintiffs have suffered damages in the amount of $10,000,000, to be determined at trial.

**THIRTEENTH CLAIM FOR RELIEF**

**(Trespass – against Church Defendants)**

[226] Plaintiffs reallege and incorporate by reference all those allegations set forth above and below as though fully set forth herein.

[227] Church Defendants have never had permission to enter the Mouraveiko Property, yet have caused foreign materials to enter the Mouraveiko Property, have removed materials from the Mouraveiko Property, and have entered the Mouraveiko Property on various occasions since September 1, 2020.

[228] Plaintiffs have suffered damages in the amount of $10,000,000, to be determined at trial.

**FOURTEENTH CLAIM FOR RELIEF**

**(Punitive Damages – against all Defendants)**

[229] Plaintiffs reallege and incorporate by reference all those allegations set forth above and below as though fully set forth herein.



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398

[230] Defendants acted with reckless disregard for the consequences of their actions and likelihood of harm and damage to others, including Plaintiffs, therefore Plaintiffs are entitled to punitive damages, except on the RICO and Timber Trespass claims, in an amount to be determined at trial.

**PRAYER FOR RELIEF**

**Wherefore** Plaintiffs pray for the following relief:

a. Economic and noneconomic damages, including

   1. On their First, Third and Fifth Claims, damages not less than $32,000,000;

   2. On their Second Claim, damages not less than $1,500,000;

   3. On their Fourth Claim, damages not less than $5,000,000;

   4. On their Sixth through Thirteenth Claims, inclusive, damages not less than $10,000,000;

b. Treble damages as allowed under RICO and Timber Trespass;

c. Punitive damages on all claims, except the RICO and Timber Trespass claims, in an amount to be determined at trial;

d. Pre- and post-judgment interest as allowed by law;

e. Their costs of suit, including reasonable attorneys' fees, as provided by law;

f. And any other relief this Court deems just and equitable.

KATHRYN ASH

By: [signature]

TIM MOURAVEIKO

By: [signature]

DATED this 1st day of September, 2026.



Tim Mouraveiko & Kathryn Ash
5006 SW Pomona St
Portland OR 97219
Tel. 503-972-0398